UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

STEFANIE HIRT, et al.,                             :

                     Plaintiffs,       :       **OPINION AND ORDER**

      -against-                              :       **GRANTING AND DENYING**

                                :       **SUMMARY JUDGMENT**

THE EQUITABLE RETIREMENT PLAN     :

FOR EMPLOYEES, MANAGERS AND       :       01 Civ. 7920 (AKH)

AGENTS, et al.,                                    :

                    Defendants.     :

------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Plaintiffs are long-term employees, managers and agents of The Equitable Life Assurance Society of America ("Equitable"). They filed this lawsuit, for themselves and others similarly situated, to challenge changes by Equitable to its retirement plans. By a series of resolutions and notices, beginning November 1988 and over the next several years, Equitable announced changes in its plans, converting them from defined benefits based on an average of final years of compensation, to annually adjusted cash balance plans. Plaintiffs allege that the amendments (1) were put into effect without having given proper notice to all participants and (2) discriminate against older employees.

        The pre-trial proceedings have been extensive. I granted Plaintiffs' motion for class certification, and certified the class alleged in the complaint and the adequacy of Plaintiffs as class representatives. The parties have conducted discovery of witnesses and experts, and I have conducted an evidentiary hearing of Defendants' procedures in delivering notices to participants. Both Plaintiffs and Defendants now move for summary judgment, and both sides represent that there are no triable issues of any material fact. Their briefs and submissions fully develop the issues and the few cases in this burgeoning area of pension practice.

For the reasons discussed in this Opinion, I hold that Equitable's amendments to its retirement plans do not discriminate against participants on account of age, but that Equitable's notice of December 1990 was materially defective, substantively and procedurally. Although Equitable's Summary Plan Description sent to all participating agents, employees and managers on December 10, 1992 substantially cured the deficiencies of content, the cure was made well after the effective date of change for employees and managers, and therefore could not validate the amendments previously intended for them. The earliest effective date of the amendments is fifteen days after the date of the notice, or January 1, 1993. As to agents, the 1992 Summary Plan Description constituted fair notice under ERISA.

Accordingly, I grant summary judgment for Plaintiffs, and I deny summary judgment for Defendants. However, the consequence of this decision requires additional resolution in order to become final, as described in the last paragraphs of this Opinion.

## I.   THE PRIOR PROCEEDINGS

Plaintiffs filed their class action complaint August 23, 2001. The first claim for relief alleged that, by reducing the rate of accruals based on age, the Plan violates ERISA's prohibition on reductions on account of age or service. 29 U.S.C. § 1054(b)(1)(H)(i) (2006). The second alternative claim for relief alleged that the change to the Cash Balance formula, which caused a significant reduction in the rate of future benefit accrual, was not provided to Plaintiffs with adequate notice. Id. § 1054(h). The third alternative claim for relief alleged that the application of the Cash Balance formula retroactively reduced accrued benefits. Id. § 1054(g). By stipulation filed April 18, 2002, the third alternative claim for relief was dismissed with prejudice.

Plaintiffs filed a motion to certify this action as a class action on April 10, 2002, pursuant to Rule 23 of the Federal Rules of Civil Procedure. Upon consent of the parties, and pursuant to Rule 53 of the Federal Rules of Civil Procedure, I appointed David S. Preminger as Special Master to make recommendations regarding class certification. (Order dated Sept. 6, 2002). Through his Revised Report and Recommendation filed October 31, 2002, and statements made before the Court at a hearing on October 29, 2002, the Special Master reported that although Plan participants had interests which diverged from those of the named Plaintiffs, class certification was nonetheless appropriate.

Plaintiffs filed an Amended Complaint on April 1, 2003, in response to the Special Master's Report, which alleges that (1) the implementation of the Cash Balance formula was ineffective due to inadequate notice, 29 U.S.C. § 1054(h); (2) the Cash Balance formula caused rate of benefit accruals to be reduced on account of age, id. § 1054(b)(1)(H)(i); (3) the de-grandfathering of employees and managers was ineffective due to inadequate notice, id. § 1054(h); and, in the alternative, (4) the de-grandfathering was ineffective as to five class representatives who did not receive the notice, id. § 1054(h); 29 C.F.R. § 2520.104b-1(b).

I granted Plaintiffs' motion for class certification. (Order dated May 22, 2003, filed May 23, 2003). Pursuant to Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure, I certified a class consisting of all current and former Plan participants, whether active, inactive or retired, and their beneficiaries and estates, whose accrued benefits or pension benefits are based on the Plan's Cash Balance formula. I also certified a sub-class, under the third claim for relief alleging ineffective notice of de-grandfathering, consisting of all current and former Plan participants, whether active, inactive or retired, their beneficiaries or estates, who were subject to the "de-grandfathering amendment" of the Plan.

Defendants moved for summary judgment July 30, 2003, arguing that the statute of limitation barred Plaintiffs' claims. I denied Defendants' motion, finding questions of fact regarding when notice was given and when Plaintiffs should have been aware of the alleged injury. (Order dated Oct. 24, 2003, filed Oct. 27, 2003).

Plaintiffs moved for summary judgment on liability July 1, 2004, this time to adjudicate the issues of Defendants' liability, and Defendants cross moved for summary judgment to dismiss the Amended Complaint. The parties appeared before me for oral argument October 14, 2004. I offered the parties the option of consenting to my hearing the motions in a bench trial pursuant to Rule 52 of the Federal Rules of Civil Procedure (Tr. 2), but the parties declined (Tr. 3, 4). Finding significant factual disputes, I reserved decision and ordered the parties to undertake depositions and file supplementary submissions. (Tr. 91-95). Upon consideration of the supplementary submissions, I denied both motions, again finding significant factual and legal disputes. (Order dated Mar. 31, 2005, filed Apr. 17, 2005).

The parties met with me in conference April 19, 2005, at which I proposed an evidentiary hearing to resolve the major outstanding issue of fact, Equitable's notice procedures, followed by renewed summary judgment motions. By Joint Scheduling Order, the parties agreed to further depositions, an evidentiary hearing, and renewed summary judgment motions. (Order filed June 22, 2005). The parties filed the instant, renewed motions for summary judgment on July 12, 2005. They appeared for an evidentiary hearing on August 3, 2005, August 4, 2005, and August 8, 2005, and for oral argument on September 15, 2005. I granted Plaintiffs' motion for leave to supplement the record following those proceedings (Order dated Sept. 20, 2005), and denied Defendants' motion to strike the supplemental submissions (Order dated Oct. 31, 2005, filed Nov. 11, 2005).

## II. SHIFTING GROUND IN PENSIONS

Equitable for some time had three, separate retirement plans for its employees, managers and agents. Each plan was based on a formula that multiplied the number of years of a participant's credited service, times a base made up of an average of the participant's highest monthly earnings for any sixty consecutive months during a 120-month period, to yield a defined benefit at normal retirement age. The defined benefit was then compared to the participant's social security benefit, and the excess of the defined benefit was paid to the participant after retirement. The principal feature of such defined benefit plans was to weight the compensation earned by participants in their late, pre-retirement years, for these, generally, were the years of highest salaries or commissions. Equitable's plans, and similar defined benefit plans in other companies, thus rewarded the continued loyalty and the continuing service of its employees.

Defined benefit plans that satisfied the criteria provided by the Internal Revenue Code entitled participants to tax deferral of benefits until actual pay-out. Defined benefit plans' pension benefits must vest after five years, and accrued benefits must be between the 3% minimum rule and the 133 1/3 % maximum rule, in order to qualify for tax benefits on their contributions. Employers assume the risk of estimated investment returns, so that, subject to opinions of licensed actuaries, investment returns reasonably expected on the aggregate of such employers' contributions could increase, or decrease, employers' obligations.

In defined contribution plans, in contrast, each employee has an individual account consisting of contributions actually made by the employer and, depending on the plan, contributions made by the employee. The employee's pension is then paid out of this individual account, and the employee, rather than the employer, has the risk of increase or decrease in value for the account. Individual Retirement Accounts and "401-Ks" are tax advantaged examples of

defined contribution plans. Typically, they lack the leveraging features of defined benefit plans, but provide certainty of ownership to employees.

By the late 1980's, particularly in light of changing economic conditions and uncertain stock markets, companies became interested in reducing their obligations under defined benefit plans. As the nation's work force became more mobile, the interest of participants in earlier vesting and more flexible portability of their retirement benefits also grew. Cash balance plans were introduced to satisfy these interests. Cash balance plans typically are a hybrid of traditional defined benefit and defined contribution plans, but are dealt with by the statutes as a species of defined benefit plans. Under these plans, each participating employee has an account in which the employee earns hypothetical pay credits based on the employee's wages, salary or other compensation, supplemented by hypothetical interest credits. Like defined benefit plans, the employees' cash accounts are hypothetical, reflected by balance sheet obligations of the sponsoring company and such reserves as may support those obligations under generally accepted accounting principles or governing statutes, regulations, or provisions of a collective bargaining agreement. Like defined contribution plans, cash balance plans tend to feature earlier vesting and portability, that is, the employee does not lose his/her cash account if s/he leaves his/her job before reaching retirement age. Cash balance plans in themselves are not controversial; it is the conversion from defined benefit plans to cash balance plans that has given rise to litigations like this one. See Campbell v. BankBoston, N.A., 327 F.3d 1, 8 (1st Cir. 2003).

A. The 1988 Amendment Affecting Employees and Managers

i. *The Resolution of November 1988*

By resolution of November 17, 1988 (the "1988 Resolution"), Equitable's Board of Directors, citing the recently enacted Tax Reform Act of 1986,[1] resolved to merge its separate retirement plans for its employees and managers into one plan, and to amend the plan by changing the then existing Final Average Monthly Earnings formula to a Cash Balance formula, effective January 1, 1989. Pursuant to the Cash Balance formula, a hypothetical Cash Account was to be created for each participating employee and manager of Equitable, and Equitable, upon the participant's retirement, would be obligated to provide to the participant either the lump sum of the account or an annuity of equal value. Provisions for pay out were provided also for participants when employment was terminated before reaching retirement age. The Cash Account for each participant was to be an accumulation of hypothetical monthly contributions, measured by 5% of the participant's annual compensation up to the participant's Social Security yearly (FICA) benefits base, and 10% of the excess of the employee's compensation over such base, plus minimum, undefined, monthly interest on such sums. The resolution of Equitable's Board also provided for a more liberal vesting of benefits, to occur upon five years of credited service, and for the cessation of cost-of-living adjustments ("COLAs") for retirement benefits accruing after December 31, 1988.

The resolution of Equitable's Board provided that the amendment should not affect existing participating employees and managers. All plan participants as of December 31, 1988 were "grandfathered," so that the benefits accrued under the employees' or managers' plan as of December 31, 1988, including post-retirement COLA benefits, were frozen. These Earned

[1] The Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, effected significant changes to the Internal Revenue Code, including simplification of the code, broadening of the tax base, and elimination of many tax shelters. Specifically in the context of employer deferred compensation contributions, it altered the minimum vesting standards required for an employee retirement plan to qualify as a trust, and thus receive tax advantages, under the Code. Id. § 1113, 100 Stat. at 2446-48 (codified at 26 U.S.C. § 411(a) (2006)).

Benefits were to be summed with the greater of (1) the benefits for employment after December 31, 1988 as calculated using the Final Average Monthly Salary formula using total years of Credited Service, without COLA benefits; or (2) the benefits for employment after December 31, 1988 as calculated using the Cash Balance formula without COLA benefits.

### ii.    *The Notice of December 1988*

Equitable issued notice of its merged and amended retirement plans for employees and managers by a one-page letter dated December 5, 1988, addressed to "All Employees and Agency Force Managers," and an attached ten-page brochure of highlights, entitled "A Plan for the Future" (the "1988 Notice").  Equitable's "objective" in making the change, the brochure stated, was "to comply with changes mandated by current Federal law, continue to provide significant retirement security, and do so with prudent financial management."  Accordingly, the brochure stated, Equitable designed its new retirement plan to be "more responsive to the changing needs of today's workforce," with Cash Accounts "in which [the] retirement benefit grows over time" as "Pay Credits," based upon participants' monthly pay, credited by Equitable, plus interest set "at a competitive rate each year."  Upon vesting, the brochure stated, the employee will have the right, when leaving the company, to take his accumulated account "as a lump sum or have it paid as a monthly annuity at retirement."  The brochure purported to "provide only a preview of the new features" and acknowledged that it could not "answer all of [the participant's] questions."  The brochure indicated, rather, that more detailed information would be provided in early 1989.

Equitable's brochure advised employees and managers that they would benefit by becoming participants of the new plan on the first of the month following employment or appointment, and by more liberal vesting provisions that provide for vesting after five years

instead of ten years of Credited Service.  The brochure stated that the amount of Equitable's Pay Credits to participants' hypothetical Cash Accounts would be 5% of pay (inclusive of overtime and incentive compensation) up to the Social Security wage base (the point at which FICA withdrawals stop), and 10% above that wage base, plus an Interest Credit, described generally as a "competitive interest rate" to be set annually.  The brochure did not state who would determine the interest rate or how it was to be determined, but stated that the interest rate in 1989 would be 8.5%.  The brochure further explained that COLAs would not be applied to benefits accrued after December 31, 1988.  It explained that the elimination of COLA was consideration for the added "flexibility and security" provided by "the value of the cash payment available under the new Cash Account, plus the higher potential benefits provided under the amended Plan formula."

The brochure advised current plan participants that they would not be prejudiced by the new Cash Account plan, but rather that the benefits of all current plan participants under the new plan would be "at least equal" to that which they would have been under the "current formula," except that there would not be any post-retirement adjustments for COLA for benefits earned after December 31, 1998.  Retirement benefits for grandfathered participants would be comprised of two components.  The value of Credited Service through December 31, 1988, called the Earned Benefit, was to be calculated as if the employee left Equitable on December 31, 1988, including COLA benefits, and the benefits were to be paid as a monthly annuity after retirement.  Additionally, the grandfathered participant would be eligible for benefits equal to the greater of two amounts: either (1) the Cash Account balance accumulated on the basis of employment after December 31, 1988, or (2) benefits that would have been accumulated under the old formula for continued service, but without COLA.  The sum of the two components—the Earned Benefit and the greater of the post-1988 benefits under the old or new plan—would

constitute the participant's retirement benefits, and become an annuity payable over the member's life or payable, in part, as a lump sum. Alternatively, the brochure described the new plan as applied to grandfathered members as affording three possible payments: (1) the Earned Benefits plus COLA; and (2) the Cash Account balance as a lump sum or annuity, but without COLA; and, if the benefits under (2) were less than they would have been under the old plan, then (3) the hypothetical benefits under the old plan for the total years of Credited Service, less the sum of benefits under (1) and (2), without COLA.[2]

## B. The 1989 Resolution Affecting Interest Rate

A year later, by resolution dated December 14, 1989 (the "1989 Resolution") and a letter dated January 17, 1990, Equitable quantified the interest rate that it would use to add Interest Credits to participants' Cash Accounts: the average rate for one-year Treasury Bills for the twelve months preceding December every year, rounded to the nearest twenty-five basis points. For the year 1990, the rate was to be 8.0%.

## C. The 1990 Amendment and Notice Affecting Grandfathering

### i. *The Resolution of November 1990*

By resolution of November 15, 1990 (the "1990 Resolution"), Equitable's Board of Directors resolved to limit the grandfathering provision establish in 1988 to a more select group of participants, specifically to those who had "either attained age 50 or completed 20 years of vesting service by December 31, 1990." The resolution cited a memorandum dated November 7, 1990 for further details.

---

[2] Equitable's formulation suggests that accumulating benefits under the new Cash Balance formula could be greater than continued benefits under the old Final Average Monthly Earnings formula. Equitable's "A Plan for the Future" brochure, however, did not make comparisons between the old and new plans.

## ii. The Notice of December 1990

By a one-page notice dated December, 1990 addressed to "Participants in the Equitable Retirement Plan for Employees and Managers," (the "1990 Notice"), Equitable announced an amendment, effective January 1, 1991, to limit grandfathering. Thenceforth, after December 31, 1990, only those participants who either had attained age fifty or had completed twenty years of service by December 31, 1990 could receive benefits under the grandfathering provision. For all other participants, Equitable advised, retirement benefits earned after 1990 would be paid only according to the Cash Account formula. Participants were referred to an attached one-and-a-half page Benefits Update, dated December 4, 1990, for more information.

The Benefits Update referred, in turn, to the notice given by Equitable two years earlier, in December 1988, for a description of the change to Cash Accounts. The Benefits Update itself advised that, effective January 1, 1991, the "special 'grandfathering' provision" described in the 1988 Notice was to be continued only for those participants who either had attained age fifty or had completed twenty years of Credited Service. For all others, benefits earned after 1990 were to be determined only under the Cash Account formula. For more information, participants were invited to telephone the "Retirement Plan Unit" at New York City headquarters. A telephone number was given. The cover notice and the Benefits Update did not themselves provide further descriptive details of the Cash Balance plan or interest rate methodology.

## D. The 1992 Amendment and Notice Affecting Agents

### i. The Resolution of September 1992

By resolution of September 17, 1992 (the "1992 Resolution"), Equitable's Board of Directors resolved to merge its retirement plan for agents into its plan for employees and

managers, and to provide that its agents also would have their retirement benefits determined under its Cash Balance plan. The resolution referred to a memorandum of September 8, 1992 for details. The September 8, 1992 memorandum explained that certain agents—those who were at least fifty years old or had at least twenty years of service as of December 31, 1992, and "Hall of Fame" agents who were at least forty years old as of that date—would be grandfathered under the old plan for agents, and that grandfathered agents would be eligible for the higher of benefits under (1) the pre-1993 agents' plan, or (2) the Cash Balance plan, but that there would no post-retirement COLA for benefits accrued after 1992. The grandfathered group was estimated to constitute 27% of total plan participants. The extension of the Cash Balance plan to agents was estimated to decrease Equitable's GAAP expenses by $1.8 million.[3]

## ii. *The Notice of November 1992*

Equitable announced the changes to its agents on November 24, 1992 (the "November 1992 Notice") by a one-and-a-half-page letter addressed to "All Equitable Agents." The changes, it told its agents, would become effective January 1, 1993, and were intended as "an innovative approach to building [the participant's] financial security, . . . designed to be more responsive to the changing needs of today's work force." The Cash Balance formula was described as monthly Pay Credits based on 5% of monthly compensation up to the level of FICA, and 10% of compensation thereafter, plus Interest Credits "at a rate determined at the beginning of each year," guaranteed for that year. Agents with five or more years of service who left the company could take their vested Cash Accounts with them, or leave their accounts in Equitable's retirement plan. As for existing benefits before the Cash Balance plan became

---

[3] Since the Cash Accounts were hypothetical, the reduction of expenses, presumably, depicted a balance sheet reduction shown on Equitable's financial statements, and not a reduction of actual expense pay outs.

effective, they were to be "frozen" and paid following retirement, provided the participant had at least five years of service before retirement. Finally, the notice to agents stated also that there would be a grandfathering provision for those "nearing retirement," but did not identify which agents would be grandfathered. Participants were referred to a booklet that was to be distributed in early December for details. The November 1992 Notice did not mention the elimination of COLA, and did not quantify the interest that was to be paid.

### E. The Notice of December 1992

Under cover of a December 10, 1992 letter, Equitable delivered an extensive Summary Plan Document ("SPD"), entitled "Benefits: Retirement Plan" (the "1992 Notice"), to all associates—employees, managers and agents. The cover letter directed questions to Human Resources or the Operations Managers. The SPD contained three sections. Section I pertained to the Cash Balance Account; Section II discussed the Pre-1989 Formula for employees and managers; and Section III discussed the Pre-1993 Formula for agents.

#### i. SPD Section I—The Cash Balance Account

For each associate (employee, manager or agent), on the first day of the month on or after reaching age twenty-one and completing one year of service, a Cash Balance Account was to be established. The account was not to be an actual account holding actual contributed amounts, but was to be established "for record-keeping purposes only," without withdrawal or borrowing rights for the participant prior to retirement or termination of employment. Equitable was to incur the obligation to contribute Pay Credits to the account, at the 5% and 10% contribution levels previously discussed, plus Interest Credits each month. Earnings, as the basis for Equitable's contribution obligations, were defined broadly, to include overtime, shift differentials, and short-term incentive compensation and, for agents, various categories of

commissions.  Equitable obligated itself to credit interest monthly, at a rate established in advance each year, to be applied to the Cash Balance as of the first day of each ensuing month. The interest rate was to be the average of one-year Treasury Bills for the twelve-month period ending November the prior year, and that rate was guaranteed for the entire year.  By way of illustration, according to the SPD, the interest rates Equitable contributed between 1989 and 1992 varied between 8.5% and 5.75%.  The SPD presented a table depicting retirement benefits under the Cash Balance plan for participants with five to forty years of participation in Equitable's plans.  The table assumed an annual salary of $30,000 and calculated retirement benefits projected on the basis of three sets of annual interest rates: 4%, 6%, and 8%.

Participants were to be vested after five years of service, or upon reaching sixty-five or dying during active service.  Retirement was to be available at age fifty-five if the participant had ten years of service, or upon the participant's reaching age sixty-five.  On the first day of the first month following retirement, the Cash Account could be paid as a lump sum, or as a monthly annuity, and participants could withdraw their Cash Account upon earlier termination of employment.  Cash Account payments were not adjusted for COLA.

ii.     *SPD Section II—The Pre-1989 Formula for Employees and Managers*

For employees and managers who were participants in the retirement plan as of December 31, 1988, and continued service after that date, the SPD explained their eligibility for two categories of benefits upon retirement or earlier termination of service:  the frozen annuity benefit as of December 31, 1988, and the Cash Account thereafter.  The SPD also explained the availability of post-retirement COLAs for both categories of benefits.

The Pre-1989 Formula calculated the frozen annuity benefit as a multiple of the employee's or manager's Final Average Monthly Earnings and years of Credited Service, less

the Social Security offset.  The "Final Average Monthly Earnings" were calculated as the average of highest monthly earnings for any sixty consecutive months during the 120-month period ending December 31, 1988, or for the entire work period if less than 120 months were worked.  Only Credited Service counted toward the benefit calculation, and an employee or manager had to be over twenty-five years old before 1985, and over twenty-one years old after 1985, for service to be credited.  The years of Credited Service were used to calculate a "Service Reduction Factor," so that, if the employee or manager had worked fewer than thirty years, the Final Average Monthly Earnings were multiplied by a Service Reduction Factor equal to the fraction of Credited Service years divided by thirty.  The "Social Security Offset" was calculated as 80% of the employee's or manager's Estimated Social Security Benefit, multiplied by a factor known as the "PIA Reduction Factor."  The "Estimated Social Security Benefit" was calculated either assuming continued employment at the employee's or manager's 1988 wage until age sixty-five, or, upon the employee's or manager's request, using actual Social Security earnings history at retirement.  The "PIA Reduction Factor" was calculated by dividing the employee's or manager's years of Credited Service as an employee or manager as of December 31, 1988 by the total years of Credited Service as an employee, manager, or agent if the employee or manager had continued to work until age sixty-five.  The actual Pre-1989 Formula used to calculate the frozen benefits was stated as:

> (60% of Final Average Monthly Earnings) x (Service Reduction Factor) – (Social Security Offset) = Retirement Benefit under Pre-1989 Formula.

The introduction of the Cash Account froze this base calculation for participants as of December 31, 1988, except to the extent that the formula may have been applied to later earnings for grandfathered employees and managers.

Examples were provided for a participant who retired at age sixty-five with twenty-four years of Credited Service as of December 31, 1988, and Final Average Monthly Earnings of $2,000. That was compared to a minimum benefit formula, a formula helpful to those earning less than $20,000 per year. Tables were also provided for early retirement at age fifty-five or older. Those retiring early were entitled to receive a temporary annuity that supplemented the early retirement benefit until the participant reached age sixty-five, and examples were provided for that.

Benefits accrued before December 31, 1988 were eligible for post-retirement COLAs, up to an annual 6% increase or decrease, based on changes in the Consumer Price Index for Urban Wage Earners and Clerical Workers in the United States for the twelve-month period ending September 30th of a given year, applied after January 1 of the following year. Benefits accrued after December 31, 1988 were not eligible for COLAs.

### iii.   SPD Section III—The Pre-1993 Formula for Agents

For agents who were participants in the retirement plan as of December 31, 1992, and continued service after that date, the SPD explained their eligibility for two categories of benefits upon retirement or earlier termination of service: the frozen annuity benefit as of December 31, 1992, and the Cash Account thereafter. The SPD also explained the availability of post-retirement COLAs for both categories of benefits.

The SPD described the Pre-1993 Formula as a "Career Accrual Formula." An agent's annuity benefit was calculated by adding a percentage of the agent's Annual Total Commissions for each year of participation from 1984 through 1992 to the agent's January 1, 1984 Accrual Base, less the estimated Social Security benefit. Specifically, the SPD presented the following formula for calculating monthly benefits under the Pre-1993 Formula:

(January 1, 1984 Monthly Accrual Base) + $[(^1/_{12})$ x (2% of Annual Total Commissions for each year of participation 1984-1992)] + (Ad-Hoc COLA Adjustments) – (Social Security Offset) = Retirement Benefit under the Pre-1993 Formula.

The Accrual Base was calculated as the Minimum Guaranteed Benefit, plus two-thirds of the Estimated Social Security Benefit, multiplied by the PIA Reduction Factor, all as of December 31, 1983. The Minimum Guaranteed Benefit was defined as the monthly benefit earned under the Final Average Pay Formula in effect for agents until December 31, 1983. The PIA Reduction Factor was calculated as the fraction of Credited Service as of December 21, 1992 over total years of Credited Service the agent would have worked until age sixty-five. The Ad-Hoc Adjustments were detailed for the relevant years, ranging from 0% in 1984 to 11.8% in 1990. The Social Security Offset was calculated as two-thirds of the estimated Social Security Benefit multiplied by the PIA Reduction Factor.

The SPD included an example of the calculation of benefits under the Pre-1993 Formula. It assumed the agent was fifty-six years old, with twenty-seven years of Credited Service as of December 31, 1992. It assumed an Accrual Base of $1,400 per month, Annual Total Commissions increasing from $40,000 to $48,000, and an estimated Social Security Benefit of $1,120 per month. The SPD calculated a monthly benefit under the Pre-1993 Formula equal to $1,894, which would be in addition to benefits subsequently earned in the Cash Account.

The SPD explained that early retirement was an option under the Pre-1993 Formula. Retirement was available as early as fifty-five, as long as the agent had completed at least ten years of Vesting Service. If an agent were to retire before age sixty-five, their monthly annuity benefits would be reduced by a factor, according to the number of vested years. The

SPD included examples of the calculation of reduced early retirement benefits under the Pre-1993 Formula.

Benefits accrued before December 31, 1992 were eligible for post-retirement COLAs, up to an annual 6% increase or decrease. In addition, a 2% step-up increase applied to benefits earned before January 1, 1984, whereby for each year for the first ten years of retirement an additional 2% would be added to the COLAs. Benefits accrued after December 31, 1992 were not eligible for COLAs.

### iv.   *SPD—Benefits for Grandfathered Participants*

The SPD described the retirement benefits for participants who were eligible for grandfathering under the Pre-1989 Formula for Employees and Managers and under the Pre-1993 Formula for Agents. Grandfathered participants would not lose eligibility for benefits under the pre-cash-balance plans. However, the benefits accruing after the effective date of the Cash Balance plan for their respective group, either in the form of Cash Account benefits or Additional Grandfather Benefits, would not be eligible for post-retirement COLAs.

#### 1.   *Benefits for Grandfathered Employees*

The SPD provided that employees who were participating in the plan as of December 31, 1988, and who were at least fifty years old on December 31, 1990 or who had completed twenty or more years of Vesting Service by December 31, 1990, were grandfathered under the Pre-1989 Formula. The SPD presented the formula for calculating grandfathered employees' retirement benefits as:

> (Frozen Annuity Benefit under the Pre-1989 Formula on December 31, 1988 + post-retirement COLA) + (Cash Balance Account) + (Additional Grandfather Benefit) = Retirement Benefit under the Employee Grandfather Provision.

A grandfathered employee was eligible for the Additional Grandfather Benefit if the benefits the employee would receive from the Frozen Annuity Benefit and the Cash Balance Account were less than those the employee would have received under the Pre-1989 Formula for all of the years of Credited Service and Earnings.

The SPD offered examples of the calculation of benefits under the grandfather provision for employees. The first example assumed the benefits under the Frozen Annuity Benefit and the Cash Account were less than those under the Pre-1989 Formula counting all years of Credited Service, and showed the calculation of the Additional Grandfather Benefit. The second example assumed the benefits under the Frozen Annuity Benefit and the Cash Account were more than those under the Pre-1989 Formula, and showed that the grandfathered employee would enjoy the increased benefits of the Cash Balance Account without any Additional Grandfather Benefit.

The SPD explained the Pre-1991 Grandfathering Provision, under which employees who participated in the plan as of December 31, 1988, but were younger than fifty and had fewer than twenty years of Vesting Service as of December 30, 1990, were eligible for grandfathering only through December 31, 1990. The Pre-1991 Grandfathering Provision functioned the same as the previously described grandfathering for employees, but applied to an abbreviated amount of time, that is between December 31, 1998 and December 31, 1990.

2. *Benefits for Grandfathered Managers*

The SPD provided that managers who were participating in the plan as of December 31, 1992, and were at least fifty years old on December 31, 1992, had completed twenty or more years of Vesting Service by December 31, 1992, or were entitled to "Hall of Fame" treatment by December 31, 1992, were grandfathered under the Pre-1989 Formula. The

SPD directed those grandfathered managers to the description of the Pre-1989 Formula in Section II of the SPD.

Individuals participating in the plan as of December 31, 1988 but not active managers on December 31, 1992, were eligible for grandfathering only under the Pre-1993 Manager Formula. The SPD explained that the benefits for grandfathered managers would be calculated by the following:

> (Frozen Annuity Benefit under the Pre-1993 Formula for Agents on December 31, 1992) + (Frozen Annuity Benefit under the Pre-1989 Formula for Employees and Managers on December 31, 1988) + (Cash Balance Account) + (Additional Grandfather Benefit) = Retirement Benefit under the Manager Grandfather Provision.

A grandfathered manager was eligible for the Additional Grandfather Benefit if the benefits the manager would receive from the Frozen Annuity Benefits and the Cash Balance Account were less than those the manager would have received under both the Pre-1989 Formula for all of the years of manager Credited Service and the Pre-1993 Formula for all of the years of agent Credited Service and Annual Total Commissions.

The SPD offered examples of the calculation of benefits under the grandfather provision for managers. The first example assumed the benefits under the Frozen Annuity Benefits under the Pre-1989 and Pre-1993 Formulas and the Cash Account were less than those under both the Pre-1989 Formula for all of the years of manager Credited Service and the Pre-1993 Formula for all of the years of agent Credited Service and Annual Total Commissions, and showed the calculation of the Additional Grandfather Benefit. The second example assumed the benefits under the Frozen Annuity Benefit and the Cash Account were more than those under the Pre-1989 and Pre-1993 Formulas, and showed that the grandfathered manager would enjoy the increased benefits of the Cash Account without any Additional Grandfather Benefit.

### 3.   Benefits for Grandfathered Agents

The SPD explained that agents who were participating in the plan as of December 31, 1992, and were at least fifty years old on December 31, 1992, had completed twenty or more years of Vesting Service by December 31, 1992, or were entitled to "Hall of Fame" treatment by December 31, 1992, were grandfathered under the Pre-1993 Agent Formula.

The SPD presented the formula for calculating grandfathered agents' retirement benefits as:

> (Frozen Annuity Benefit under the Pre-1993 Formula on December 31, 1992 + post-retirement COLA + 2% Step-Up) + (Cash Balance Account) + (Additional Grandfather Benefit) = Retirement Benefit under the Agent Grandfather Provision.

The grandfathered agent was eligible for the Additional Grandfather Benefit if the benefits the agent would receive from the Frozen Annuity Benefit and the Cash Account were less than those the agent would have received under the Pre-1993 Formula for all of the years of Credited Service and Annual Total Commissions.

The SPD offered examples of the calculation of benefits under the grandfather provision for agents.  The first example assumed the benefits under the Frozen Annuity Benefit and the Cash Account were less than those under the Pre-1993 Formula counting all years of Credited Service and Annual Total Commissions, and showed the calculation of the Additional Grandfather Benefit.  The second example assumed the benefits under the Frozen Annuity Benefit and the Cash Account were more than those under the Pre-1993 Formula, and showed that the grandfathered agent would enjoy the increased benefits of the Cash Account without any Additional Grandfather Benefit.

**F.  The Amendment and Notice Affecting Interest Rates**

   ***i.  The Plan Document of December 1994***

   The 1994 Plan document, adopted on December 29, 1994, set a minimum interest guarantee for Interest Credits to be credited to Cash Accounts.  The Plan document indicated that all Interest Credits made to Cash Accounts would be not less than 4%.  Prior to that adoption, interest was to be fixed year to year, as was described in the 1988 Notice and illustrated in the 1989 Resolution.  Following 1994, the Interest Credit that was to be awarded with each Pay Credit to plan participants would be the greater of the average rate for one-year Treasury Bills for the twelve months preceding December every year, rounded to the nearest twenty-five basis points, or 4%.

   ***ii.  The Notice of 1996***

   Equitable delivered an SPD, entitled "Equitable Benefits: Retirement Plan" and dated January 1996 (the "1996 Notice") to participants.   The SPD indicated that the interest rate used, which was to be established each year, was "subject to a minimum crediting rate of 4%" and would be the "average of one-year Treasury Bills for the 12-month period ending in November of the prior year."  The SPD stressed that "[i]t's important to note that the interest rates are guaranteed for the entire year," and included a table of interest rates applied each year since the adoption of the Cash Balance plan, which ranged from 8.5% in 1989 to 5.0% in 1995.

**G.  Practices and Procedures in Delivering Notices**

   Equitable did not have written rules regulating the procedures for distribution of notices of pension plan amendments to the participants and beneficiaries of its plans.  Equitable's Employee Benefit Communications Plan, an inter-executive set of objectives and goals, did not

contain a protocol on how written notices should be disseminated to assure that all participants and beneficiaries actually receive advice of plan amendments.

Equitable's executives testified, however, to the practices that were to be followed. Thus, Robert Sjorgren, Vice-President of Employee Benefits, Timothy Collins, Vice-President of Benefit Administration, Kevin Clark, Director of Retirement Plans, and Robert Keane, Vice-President of Executive Benefits, testified that notices of amendments to pension plans, including the notices in question in this lawsuit, were distributed in much the same way as paychecks were distributed, and according to payroll lists. The Benefits Administration Department delivered sufficient copies of the notices, in bulk through Equitable's inter-office delivery system, to the payroll representative and/or operations manager in each divisional or agency office, more than enough for each individual listed on the payroll in that office. Typically, a cover memorandum accompanied the notices sent by bulk delivery to the divisional and agency offices, identifying the categories of recipients of the contents. (See, e.g., Jt. Trial Exs. 10, 33, Tr. 144). However, based on the testimony of one branch operations manager, it appears that cover memoranda did not always accompany the bulk deliveries. (See, e.g., Tr. 235, 243, 268). The payroll representative and/or operations manager then distributed the notices to each active payrollee by placing it on his or her desk or in his or her pigeonhole/mail cubby. For those individuals listed as inactive, the payroll system provided a home address, and the Benefits Administration Department sent the notice via first class mail to each inactive payrollee. For those participants receiving long term disability benefits, the Benefits Administration Department obtained home addresses from the third-party administrator, and the payroll representative and/or operations manager was responsible for sending the notice via U.S. mail to each such individual.

A number of regional and agency operations managers testified as to the practices they followed. In some offices, the managers took care that the notices were placed in individual cubby holes or on desks, and mailed to individuals temporarily out of the office. In other offices, the mail room itself was responsible for the distribution of bulk mail, sometimes without the intervention or direction of the manager. (<u>E.g.</u>, Tr. 156, 171). Some managers indicated that they, as well as their mail rooms, ranked mail into high and low priorities, where unaddressed bulk mail from corporate headquarters was afforded the lower priority. (Tr. 244, 268-71). During busy periods, in some offices, low priority mail would be piled on cabinets for individuals to retrieve at their leisure.

## III. STANDARD OF REVIEW

Both sides have moved for summary judgment, both representing that there are no material issues to be tried. When, previously, after an earlier round of summary judgments, I found triable issues of fact concerning Equitable's practices and procedures in delivering notices sent to participants, the parties withdrew their motions at my suggestion, and presented witnesses over four days of evidentiary hearings. The parties also consented to my acting as trier of the facts with respect to the issues thus presented, and the motions were then renewed. Thus, I am able to present my findings and conclusions on the record thus enhanced.

Summary judgment may be granted if there are "no genuine issues as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The moving party bears the burden of "informing the district court of the basis for

its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to come forward with competent evidence:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001), that party must raise more than just a "metaphysical doubt" as to a material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen, 273 F.3d at 499. Accordingly, if the "evidence favoring the nonmoving party" "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

With regard to the issues of Equitable's delivery of notices, I function as the trier of facts, finding according to the preponderance of the credible evidence. Fed. R. Civ. P. 52.


## IV. NOTICE REQUIREMENT

### A. Law

#### i. Statutory Provisions

Section 204(h) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1054(h), forbids sponsors of pension plans from significantly reducing

the rate of future benefit accruals without proper written notice by the plan administrator to all participants affected by the reduction. The precise text of this statutory requirement has changed over time. The changes are described below.

The requirement of notice as a precondition to the effectiveness of amendments was introduced in 1986. See Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 11006, 100 Stat. 82, 243-44 (1986) (codified as amended at 29 U.S.C. § 1054). COBRA amended section 204 of ERISA, 29 U.S.C. § 1054, to prohibit amendment of single employer plans to reduce the rate of future benefit accruals unless each participant and each beneficiary of the plan was given timely notice that set forth the amendment and its effective date. The timeliness of the notice was prescribed; it had to be given after the amendment was adopted and at least fifteen days before the amendment became effective.

> **(h)** A single-employer plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to –
>
> **(1)** each participant in the plan,
> **(2)** each beneficiary . . . , and
> **(3)** each employee organization representing participants in the plan,
>
> except that such notice shall instead be provided to a person designated, in writing, to receive such notice on behalf of any person referred to in paragraph (1), (2), or (3).

Id. § 11006(a), 100 Stat. at 243. The statutory amendment was applicable to any plan amendments adopted on or after January 1, 1986. Id. § 11006(b), 100 Stat. at 243.

Congress, effective June 7, 2001, strengthened and clarified the form of notice that had to be given, so as "to be understood by the average plan participant," with "sufficient

information . . . to allow applicable individuals to understand the effect of the plan amendment," and "within a reasonable time before the effective date of the plan amendment." Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"), Pub. L. No. 107-16, § 659(b), 115 Stat. 38, 139-41 (codified as amended at 29 U.S.C. § 1054(h)).[4]  The statutory amendments sought to lengthen the period between the required notice and the plan amendment's effective date, because the fifteen-day standard "was perceived as often being insufficient."  Prop. Treas. Reg. § 1.411(d)-6, 67 Fed. Reg. 19,713, 19,715 (Apr. 23, 2002).  The statutory amendments arose out of particular concern "about the effects of conversion of traditional defined benefit plans to cash balance and hybrid formula plans."  Id. at 19,716 (citing H.R. Rep. No. 107-84, at 266 (2001) (Conf. Rep.)).  The Secretary of the Treasury was authorized to issue regulations prescribing the extent of the information that would have to be provided.  The statutory text follows:

> (h)(1) An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual (and to each employee organization representing applicable individuals).
>
> (2) The notice required by paragraph (1) shall be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information (as determined in accordance with regulations prescribed by the Secretary of the Treasury) to allow applicable individuals to understand the effect of the plan amendment. . . .
>
> (3) Except as provided in regulations prescribed by the Secretary of the Treasury, the notice required by paragraph (1) shall be provided within a reasonable time before the effective date of the plan amendment.

---

[4] Congress made additional, non-substantive changes to the statutory text, before and after the 2001 amendments.  Since they do not affect my analysis, I do not describe them.

(4) Any notice under paragraph (1) may be provided to a person designated, in writing, by the person to which it would otherwise be provided.

(5) A plan shall not be treated as failing to meet the requirements of paragraph (1) merely because notice is provided before the adoption of the plan amendment if no material modification of the amendment occurs before the amendment is adopted.

(6)(A) In the case of any egregious failure to meet any requirement of this subsection with respect to any plan amendment, the provisions of the applicable pension plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of—

> (i) the benefits to which they would have been entitled without regard to such amendment, or
> (ii) the benefits under the plan with regard to such amendment.

(B) For purposes of subparagraph (A), there is an egregious failure to meet the requirements of this subsection if such failure is within the control of the plan sponsor and is—

> (i) an intentional failure (including any failure to promptly provide the required notice or information after the plan administrator discovers an unintentional failure to meet the requirements of this subsection),
> (ii) a failure to provide most of the individuals with most of the information they are entitled to receive under this subsection, or
> (iii) a failure which is determined to be egregious under regulations prescribed by the Secretary of the Treasury.

(7) The Secretary of the Treasury may by regulations allow any notice under this subsection to be provided by using new technologies.

(8) For purposes of this subsection—

> (A) The term "applicable individual" means, with respect to any plan amendment—

> (i) each participant in the plan; and
> (ii) any beneficiary who is an alternate payee (within the meaning of section 206(d)(3)(K)) under an applicable qualified domestic relations order (within the meaning of section 206(d)(3)(B)(i)),

whose rate of future benefit accrual under the plan may reasonably be expected to be significantly reduced by such plan amendment.

> (B) The term "applicable pension plan" means—

> (i) any defined benefit plan; or
> (ii) an individual account plan which is subject to the funding standards of section 412 of the Internal Revenue Code of 1986.

> (9) For purposes of this subsection, a plan amendment which eliminates or significantly reduces any early retirement benefit or retirement-type subsidy (within the meaning of subsection (g)(2)(A)) shall be treated as having the effect of significantly reducing the rate of future benefit accrual.

EGTRRA § 659(b), 115 Stat. at 140 (codified as amended at 29 U.S.C. § 1054(h)).  The statutory amendment was applicable to any plan amendments adopted on or after June 7, 2001.  Id. § 659(c), 115 Stat. at 141.

### ii.  *Regulatory Provisions*

Regulations promulgated under section 204(h) clarifying the notice requirement postdate the events in question.  Temporary regulations were issued in 1995, and final regulations were issued in 1998 and 2003.

The Internal Revenue Service ("IRS") within the Department of the Treasury issued temporary regulations and published a notice of proposed rulemakings, pursuant to the statutory authority provided in ERISA, on December 15, 1995.  See Temp. Treas. Reg. § 1.411(d)-6T, 60 Fed. Reg. 64,320 (1995); Prop. Treas. Reg. § 54.4980F-1, 60 Fed. Reg. 64,401 (Dec. 15, 1995).  The temporary regulations were applicable for plan amendments adopted on or after December 15, 1995, and effective on or after January 2, 1996, in order to "assure that the rights of participants in plans subject to section 204(h) of ERISA are protected."  60 Fed. Reg. at 64,402.  The IRS further stated that the issuance of immediate, temporary regulations, without

prior notice or comments, was necessary given the "broad range of plan amendments" that give rise to issues under section 204(h), including "amendments prompted by recent changes in law." 60 Fed. Reg. at 64,320. After notice and comments, final regulations were issued December 14, 1998, and applied to plan amendments adopted on or after December 12, 1998. Treas. Reg. § 1.411(d)-6, 63 Fed. Reg. 68,678 (1998).

The final regulations issued in 1998 sought to "provide guidance on the requirements of section 204(h)" of ERISA. 63 Fed. Reg. at 68,678. First, the regulations clarified when a section 204(h) notice was required. It specified that an "amendment that affects the rate of future benefit accrual" is one that is "reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." Id. at 68,681. The regulations encompassed amendments to a wide range of plan provisions, including "the dollar amount or percentage of compensation on which benefit accruals are based" and "the method of determining average compensation for calculating benefit accruals," but did not affect vesting schedules. Id. Whether the amendment provides for a "significant reduction" was to be determined "based on reasonable expectations taking account the relevant facts and circumstances at the time the amendment is adopted." Id.

The regulations also clarified the mechanisms and substance of compliant notices. The notice could contain a "summary of the amendment, rather than the text of the amendment, if the summary is written in a manner calculated to be understood by the average plan participant." Id. at 68,682. Delivery of the notice could be effected in "any method reasonably calculated to ensure actual receipt." Id. The regulations also explained the effects of failure to comply with section 204(h) notice requirements. If the plan administrator made a "good faith effort to comply" or, upon observance of an oversight resulting in failure to provide notice to "no

more than a de minimis percentage of participants," "promptly" provided notice to those participants to whom notice was not provided, the amendment would be effective in accordance with its terms to all participants.  Id. at 68,683.

Following amendment of section 204(h) in 2001, the IRS published a notice of proposed rulemaking in 2002, Prop. Treas. Reg. § 54.4980F-1, 67 Fed. Reg. 19,713 (Apr. 23, 2002), and, after notice and comments, promulgated final regulations issued April 9, 2003 and effective that same day, Treas. Reg. § 54.4980F-1, 68 Fed. Reg. 17,277 (2003).  The regulations seek to "strike a balance between giving participants . . . notice long enough in advance to enable them to understand and consider the information before the amendment goes into effect, and allowing employers the ability to effect changes to their plans for business reasons . . . within a reasonable time."  67 Fed. Reg. at 19,715.  The IRS noted that the final regulations responded to "particular concern . . . expressed about the effects of conversion of traditional defined benefit plans to cash balance or hybrid formula plans."  Id. at 19,716 (citing H.R. Rep. No. 107-84, at 266 (2001) (Conf. Rep.)).

The final regulations issued in 2003 gave further guidance in the context of statutory amendments adopted in 2001.  First, in response to the statutory change to require notice within a "reasonable time," the IRS provided that notice should generally be provided at least forty-five days before the amendment's effective date.  68 Fed. Reg. at 17,283.  In response to the statutory amendment requiring a notice "written in a manner calculated to be understood by the average plan participant" and containing "sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment," EGTRRA § 659(b), 115 Stat. at 140 (codified as amended at 29 U.S.C. § 1054(h)), the IRS provided that a notice "must include a [narrative] description of the benefit or allocation formula prior to the amendment, [and] a

description of the benefit or allocation formula under the plan as amended." 68 Fed. Reg. at

17,285. The descriptions were to include "readily compare[able]" terms. Id. at 17,287. For

amendments changing from "a traditional defined benefit formula to a cash balance formula," the

notice was required to include "one or more illustrative examples showing the approximate

magnitude of the reduction in the examples." Id. Generally, for "any case in which it is not

reasonable to expect that the approximate magnitude of the reduction for each applicable

individual will be reasonably apparent from the description of the amendment," the notice was

required to include further information. Id. The regulations specified that, for example, an

amendment that converts a defined benefit plan to a cash balance plan credited with variable

interest credits must include projections of future interest credits. Id. at 17,825-86.

Finally, the 2003 regulations provided for more specific consequences for failure

to provide notice, in response to amended statutory language that established consequences for

any "egregious failure" to meet the requirements of section 204(h). Specifically, in the case of

an egregious failure, "all applicable participants are entitled to the greater of the benefit to which

they would have been entitled without regard to the amendment, or the benefit under the plan

with regard to the amendment." Id. at 17,288. The regulations provided that a failure is

"egregious" if it is either "an intentional failure or a failure . . . to provide most of the individuals

with most of the information they are entitled to receive." Id. at 17,288-89. A failure is not

deemed egregious, however, if "the plan administrator reasonably determines . . . that the

reduction in the rate of future benefit accrual resulting from an amendment is not significant."

Id. at 17,289. In the case of a "non-egregious failure," the amendment "may become effective

with respect to all applicable individuals." Id.

## B. Discussion

Plaintiffs move for summary judgment, arguing that Defendants failed to provide adequate notice of the plan amendments as required by section 204(h) of ERISA and, as such, the amendments should not be given effect. Defendants cross move for summary judgment to dismiss the Amended Complaint. For the reasons stated below, I grant in part and deny in part Plaintiffs' motion and deny Defendant's motion, holding that the 1988 and 1992 notices were adequate, while the 1990 notice was not.

### i. *Substantive Adequacy*

#### 1. *The 1988 Notice*

The notice of December 5, 1988, which provided notice of the amendments approved by Equitable's resolution of November 17, 1988, sufficiently described the only change to grandfathered rights: the elimination of COLAs for benefits accruing after December 31, 1988. For example, on the introductory page, the brochure informed participants that "benefits earned after December 31, 1988 will not be eligible for cost-of-living adjustments after retirement." Similarly, in the overview, the brochure indicated that Earned Benefits as of December 31, 1988 would "increase through cost-of-living adjustments after retirement" but that benefits from the Cash Account or from the special grandfathered provision earned after December 31, 1988 would "not be eligible for cost-of-living adjustments after retirement." In the section entitled "A Closer Look," the brochure indicated that the portion of the retirement benefit paid based on Earned Benefits would "continue[] to be subject to cost-of-living adjustments after [one] retire[d]." These statements complied with section 204(h)'s requirement of "a written notice, setting forth the plan amendment and its effective date." See COBRA § 11006(a), 100 Stat. at 243.

The plan amendment also provided for the grandfathering of individuals who were participants in the employees' and managers' plans as of December 31, 1988, and thus did not provide for a significant reduction in the rate of future benefit accruals for employees and managers who were participants before January 1, 1989. Participants thus grandfathered, who were vested by the time they left Equitable, would be eligible for benefits equal to or greater than those provided for under the former Final Average Monthly Earnings formula, through a composition of benefits under the former plan and the new Cash Balance plan. The only benefit lost by grandfathered employees and managers under the 1988 amendment was post-retirement COLAs, and that reduction was described fairly in the 1988 Notice.

2. *The 1990 Notice*

The notice of December 4, 1990, which provided notice of amendments made by resolution of November 15, 1990, did not describe sufficiently the change to grandfathered rights: the limitation of the grandfathering provision to a more select group of employees and managers than was provided for in the 1988 amendment.

The 1990 plan amendment, as reflected in the 1990 Notice, provided that the "special 'grandfathering' provision" established by the 1988 plan amendment would be continued only for those individuals who "as of December 31, 1990, either attained age [fifty] or completed [twenty] years of service." The 1990 plan amendment, as reflected in the 1990 Notice, also provided that "for all other Plan participants, benefits earned after 1990 will be determined only under the Cash Account formula." For de-grandfathered participants, the notice did not explain how the Cash Account formula would calculate benefits, how the benefits accrued while they were grandfathered would be treated, or how their final benefit would be determined.

The first step in this analysis is to determine if the amendment—which de-grandfathered participants who were less than fifty and had completed less than twenty years of service, and offered future benefits only under the Cash Account formula—caused "a significant reduction in the rate of future benefit accrual." <u>See</u> COBRA § 11006(a), 100 Stat. at 243.

Cash balance plans are premised upon accruing a pension evenly over the course of a career, with interest credits compensating for the diminishing value of a dollar over time. Traditional defined benefits plans, on the other hand, are premised upon accruing the bulk of the pension toward the end of the career, especially when, like in this case, the final average monthly earnings is used. The conversion of these plans to cash benefit plans tends to freeze the growth of benefit accruals, and convert the value of the earned pension benefit to a cash-out amount. That amount or "account," if a worker is not yet ready to retire, is increased by monthly credits based on a percentage of the employee's compensation for that year, but the result is a lower rate of accrual, and in most cases, a lower total pension benefit than under the original defined benefit plan. Thus, initial earned benefits under a defined benefits plan followed by subsequent benefits under a cash balance plan are likely to produce a retirement benefit that is less than would have been available under the original defined benefit plan if the original plan were extended until retirement. The result of a shift from a traditional defined benefit plan to a cash balance plan, without the protection of grandfathering provision, is generally a significant reduction in the rate of future benefit accruals.

The savings that Equitable's management estimated to result from the change in pension plan is also indicative of the reduced rate of benefit accrual to participants. The aggregate amount is significant. In a summary of accomplishments, a member of Equitable's management cited $414 million cumulative costs savings over twenty years through adoption of

the Cash Balance plan for employees and managers in January 1989, $6.8 million annually through the de-grandfathering adopted in 1990, and $1.8 million annually through the merging of agents into the Cash Balance plan effected as of January 1, 1993. (Pl. Ex. 41). Similarly, in a letter dated September 8, 1992, Equitable's managers advised Equitable's Board of Directors that extension of the Cash Balance plan to agents was expected to lower annual expenses by $1.8 million. (Pl. Ex. 8).

A government study, having examined 133 pension plans that were converted to cash balance plans, found that "most workers—regardless of age—receive lower retirement benefits," and that "older workers experience the greatest decline in pension benefits unless employers take specific steps to protect them." Ellen E. Schultz, Workers of All Ages Lose Benefits in Switch to Cash-Balance Plans, Wall St. J., Nov. 5, 2005, at A4. The government study, conducted by the Government Accountability Office ("GAO") concluded that "[u]nless [they were] grandfathered into the former plan, older workers [would] experience a greater loss of expected benefits than younger workers." U.S. Gov't Accounting Office, Private Pensions: Information on Cash Balance Plans (2005). Analysis of the 133 pension plans showed that reductions in median monthly income caused by a conversion "range from $59 for conversions at age 30 to $238 for conversions at age 50." Id. at 36. The GAO report estimated that cash balance plans cost employers 5.870% immediately after the conversion, which is well below the estimated employer cost of 7.545% for traditional defined benefit plans. Id. at 66.

Plaintiffs' expert, Claude Poulin, submitted a declaration testifying that under the pre-Cash Balance formula the rate of future benefits accrual for Equitable plan participants was 1.5% of compensation, measuring rate of benefit accruals based on change in post-retirement

annuity.[5]  In contrast, under the Cash Balance plan, the rate of future benefit accrual, similarly measured is lower.  Thus, the rate of accrual was calculated to range from 1.46% to 0.43% of compensation under the Cash Balance plan.  (Pl. Ex. 3 ¶18).

Companies are free to change from traditional defined benefit plans to cash balance plans, notwithstanding that a significant reduction in future benefit accruals will result.  But they must give adequate notice that their plans are being amended.  "[E]ach participant in the plan" must be "provide[d with] a written notice, setting forth the plan amendment and its effective date."  COBRA §11006(a), 100 Stat. at 243.  The section 204(h) notice must be given after the amendment is adopted and "not less than 15 days before the effective date of the plea amendment."  Id.

Equitable's 1990 Notice advised participants that grandfathering would be continued only for those individuals who, "as of December 31, 1990, either attained age [fifty] or completed [twenty] years of service," and that all other participants would earn benefits only under the Cash Account formula.  The cover notice and the Benefits Update did not themselves provide further descriptive details of the Cash Account or interest rate.  The notice did not describe the Cash Account formula under which their benefits would be accrued.  The notice referred to, but did not enclose, Equitable's 1988 Notice, delivered two years earlier.  The notice did not offer a comparison of benefits under the Cash Balance plan to those under the former plan.  The notice did not indicate that the de-grandfathering would significantly reduce the rate

_____

[5] Section 204(h) of ERISA does not define "rate of future benefit accrual."  The 1995 Temporary Regulations and the 1998 Regulations, which post-date the plan amendments at bar, provided that reduction of rate of future benefit accrual should be understood to mean a reduction in the amount of future annual benefit commencing at normal retirement.  60 Fed. Reg. at 64,322; 63 Fed. Reg. at 63,681.  Courts have applied the standard with limited interpretation.  In Engers v. AT&T, however, the District of New Jersey held that notice of a conversion to a cash balance plan is required only if the amount of benefit is reduced, not whenever the rate of accrual is reduced.  428 F. Supp. 2d 213, 222 (D.N.J. 2006) (relying on 1995 Temporary Regulations).

of future benefit accruals.  The notice invited calls to Equitable's Retirement Plan Unit at a New York City telephone number if participants wished to gain further information.  In order to understand the Cash Account formula, de-grandfathered participants would have had to review the 1988 Notice that they had received two years earlier, if they still had it.  In order to understand the reductions in benefits that would result from its application, de-grandfathered participants would have had to have performed sophisticated calculations and comparisons.  Or, presumably, they might have been enlightened in phone conversations with someone at the New York City telephone number to which Equitable directed calls.

The 1990 Notice did not give adequate notice to de-grandfathered employees and managers about the significant reduction in retirement benefits produced by the amendment.  The section 204(h) requirement of a "written notice[] setting forth the plan amendment," as it read in 1990, implies that the material terms of the plan amendment must be in the notice itself, and not requiring piecing together from other written documents and oral statements.  The 2001 statutory amendment made explicit that which was implicit in the requirement of a notice.  The section 204(h) notice requirement, as amended in 2001, requires a notice "written in a manner calculated to be understood by the average plan participant," and "provid[ing] sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment."  EGTRRA § 659(b), 115 Stat. at 140.  A notice is intended to give fair warning, and fails to do so if it is cryptic, or requires research beyond the document itself.  Regulations promulgated after the amendment clarified that the notice must be "written in a manner calculated to be understood by the average plan participant" and must contain "sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment."  68 Fed. Reg. at 17,283.  The regulations provided that notices must contain a narrative description of the formula prior to the

amendment and the formula under the plan as amended, and allow for a comparison using readily comparable terms.  Id. at 17,285.  Notices for conversions from traditional defined benefit plans to cash balance formulas must include "illustrative examples" showing "the approximate magnitude of the reduction in the examples."  Id.

Courts have recognized the importance of adequate notice and meeting of expectations in the context of ERISA.  "[T]here can be no doubt that ERISA was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits . . . ."  Amato v. W. Union Int'l, Inc., 773 F.2d 1402, 1409 (2d Cir. 1985).  Similarly, the Supreme Court noted that "one of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time."  Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995).  In Frommert v. Conkright, the Court of Appeals for the Second Circuit held that, "[w]ithout such proper notice," a plan amendment was "ineffective" as to plan participants.  433 F.3d 254, 262-63, 268 (2d Cir. 2006) ("We, however, look to the plain meaning of the term and defined an "amendment" to a plan as taking place at the moment when employees are properly *informed* of a change.").  The notice in that case, though purportedly in the form of a SPD, was "insufficiently 'accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights.'"  Id. at 267 (quoting 29 U.S.C. § 1022(a)).  In Copeland, the court held that an amendment was "not binding on plan participants" on the basis of a "one-page ambiguous memorandum" that merely referred to a correction in the plan and did not explain the specific factors that were being eliminated.  Copeland v. Geddes Fed. Sav. & Loan Assoc'n Ret. Income Plan, 62 F. Supp. 2d 673, 678 (N.D.N.Y. 1999).  The notice was deemed not adequate, and the amendment not effective.  Id.  Noting the "obvious common sense behind [section] 204(h)," Davidson v. Canteen Corp., 957 F.2d 1404, 1408 (7th Cir. 1992), the

Court of Appeals for the Seventh Circuit considered that "Congress must have weighed" "[t]he burden such a notice requirement places on a plan sponsor," and deemed an amendment ineffective due to failure to timely and adequately notify participant. Id. at 1409; see also Prod. Employees' Local 504 v. Roadmaster Corp., 954 F.2d 1397, 1406-08 (7th Cir. 1992) ("rescind[ing]" amendments deemed ineffective for untimely and inadequate notice).

The insufficiency of Equitable's 1990 Notice—under the terms of the statute in effect at the time it was given, December 4, 1990, and the courts' interpretation of the statutory requirements—vitiates the amendment itself. The statute makes a sufficient notice a precondition to the effectiveness of the plan amendment. Thus, the statute, as it read in 1990, provides that a "plan may not be amended . . . unless . . . the plan administrator provides a written notice." COBRA §11006(a), 100 Stat. at 243. The statute as amended in 2001, providing explicitly that which was implicit in the earlier iteration, provided for the ineffectiveness of an amendment made without adequate notice, and whereby

> [i]n the case of any egregious failure to meet any requirement . . . , the provisions of the . . . plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of—(i) the benefits to which they would have been entitled without regard to such amendment, or (ii) the benefits under the plan with regard to such amendment.

EGTRRA § 659(b), 115 Stat. at 140 (codified as amended at 29 U.S.C. § 1054(h)(6)(A)). "Congress could not have been more clear," Roadmaster, 954 F.2d at 1406, as to its intent to vitiate amendments that did not comply with notification requirements.

Because Equitable's 1990 Notice was not adequate notice and therefore did not satisfy section 204(h) of ERISA, the 1990 plan amendment did not become effective.

*3. The 1992 Notice*

The notice of December 10, 1992, which provided detailed explanations of the Cash Account, the Pre-1989 Formula for Employees and Managers, and the Pre-1993 Formula for Agents, as well as grandfathering of each class of individuals under the pre-Cash Account plans, contained sufficient notice of significant reductions in benefits for employees, managers and agents.

The notice of December 1992 came in the form of a summary plan description. Although the SPD serves other important functions under ERISA, it also can qualify as notice of a plan amendment pursuant to ERISA section 204(h). Frommert, 433 F.3d at 268-69. Indeed, the SPD may be relied on by employees as their "'primary source of information regarding employment benefits,'" even controlling over conflicting provisions in the terms of the plan itself. Id. at 265 (quoting Layaou v. Xerox Corp., 238 F.3d 205, 209 (2d Cir. 2001)); see also Normann v. Amphenol Corp., 956 F. Supp. 158, 166 (N.D.N.Y. 1997); Kagen v. Flushing Hosp. Med. Ctr., No. 96-cv-5795, 2000 WL 1678015, at *4 (E.D.N.Y. Nov. 3, 2000) ("Written notice is sufficient pursuant to a number of methods, including distribution of an SPD.").

The 1992 Notice satisfied the notice requirements of section 204(h). It adequately described the Cash Balance plan, and provided illustrations to show how it would apply to retirees. It also described the former Final Average Monthly Earnings formula based on an average of final years' compensation, multiplied by years of Credited Service, and provided illustrations to show how that plan would apply to retirees who were grandfathered under the former plan. And it showed, separately for employees and managers, and for agents, how their retirement benefits would be calculated, for benefits accruing prior to the effective dates of the plan amendments, to the extent retirement benefits were frozen with respect to those earlier years, and for retirement benefits accruing for years after the effective dates. Furthermore, they

were written in a "manner calculated to be understood by the average plan participant," allowing the participants reasonably to understand the effects of the amendment.[6]  Therefore, the earliest effective date possible for the amendment was January 1, 1993, based on the effective notice contained in the 1992 Notice.

### 4.  The 1996 Notice

The 1996 Notice—the SPD that provided detailed explanations of the Cash Account, the Pre-1989 Formula for Employees and Managers, the Pre-1993 Formula for Agents, and, for the first time, the variable and minimum interest rates that would be applied monthly to Cash Account balances—also qualifies as sufficient notice under section 204(h).  However, the amendment first notified under the 1996 Notice, establishing minimum interest rates, did not cause significant reductions in benefits.

Plaintiffs argue that a minimum interest rate is an essential component of a Cash Balance plan, and that, until an amendment is passed and notice is provided setting such a minimum, amendments establishing a Cash Balance plan can not be effective.  Plaintiffs contend that provisions under ERISA and the Tax Code require that sufficient information about the plan be provided such that a plan participant could determine with some degree of certainty what his/her future annual benefit would be.  They point out that neither the 1988 Notice nor the 1990 Notice quantifies the interest rate that would be applied to accrued benefits.  The description of the interest rate was first established by the 1989 Resolution, and first provided to participants in the 1992 Notice, as an average of Treasury Bill rates.  Furthermore, Plaintiffs point out that

---

[6] The quoted language is from temporary IRS regulations promulgated in 1995, 60 Fed. Reg. at 64,323, a date later than the effective date of the plan changes.  However, they express the intent of the statute then governing significant changes in retirement plans, and they therefore are at least persuasive.  See Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 303 (2d Cir. 1971) (holding regulations issued after event served explanatory role).

neither the 1988 Notice, the 1990 Notice, nor the 1992 Notice describes any minimum rate of interest. That information was provided by the 1996 Notice, almost seven years after the initial amendment implementing the Cash Balance plan.

No provision within ERISA requires such certainty. The requirement under the Tax Code that the benefits be "definitely determinable" in order to qualify for tax benefits, 26 U.S.C. § 401(a)(25), does not apply to ERISA actuarial requirements. Stamper v. Total Petroleum, Inc., 188 F.3d 1233, 1238-39 (10th Cir. 1999). When courts have invalidated amendments that allow for variable interest rates, they have done so because companies were using low projection rates to cancel minimum interest rates guaranteed by a company's plan. See Esden v. Bank of Boston, 229 F.3d 154, 165-67 (2d Cir. 2000). The courts have not invalidated a plan for failing to set a minimum interest rate. In fact, courts require "estimation rather than determination" of benefits, because interest rates and discount rates, often tied to government securities, "fluctuate[]." Berger v. Xerox Corp., 338 F.3d 755, 760 (7th Cir. 2003) (Posner, J.).[7] Uncertainty in determining expected benefits is inevitable, due to fluctuations in salary levels, social security taxable wage base, and variable interest rates. (Ehrhardt Aff. ¶5 ("In particular, the salary increase assumption has a much bigger impact on the projected benefits tha[n] the interest credit rate.")).

The section 204(h) notice requirement does not require notification of that which is not within the four corners of the plan amendment. Further, only those plan amendments that

---

[7] Esden and Berger involved the calculation of benefits for pre-retirement cash outs. The Courts of Appeals required that the plans project the cash account balance forward to normal retirement age—using a rate not less than the minimum guaranteed interest rate, if applicable, or an estimate of the variable interest rate provided by the company's retirement plan if not—and discount back using the statutorily prescribed discount rate. In discounting to present value, the lower the discount rate, the higher the present value. In projecting forward, the higher the projection rate, the higher the ultimate value.

cause a "significant reduction" in benefits need be the subject of a notice. The use of an interest rate, whether a minimum guaranteed rate or a variable rate based on ascertainable market indicators, adds to the value of participants' cash accounts, and reduces the potential reduction in benefits resulting from the introduction of cash accounts. Certainty of interest rate is not required by statute or regulations, nor is it necessary for an understanding of the amendment that Equitable was putting into effect.

An amendment setting a minimum guaranteed interest rate was not adopted until the 1994 Plan document. No notice of the amendment was required at that time, because its adoption did not cause a "significant reduction" in rate of benefit accrual, nor at any time before that time, because certainty of interest rate is not required to effectively adopt a cash balance plan. The interest rate issue is not material to the issue of whether and when Equitable's Cash Balance plan became effective for employees and managers, and for agents.

### ii. *Procedural Adequacy*

Plaintiffs argue that the method of delivery used by Equitable—bulk mail to payroll representatives, followed by hand delivery in a mail cubby for individuals at the office and by U.S. mail for individuals not at the office—is insufficient because it does not involve individually addressed notices sent by Equitable headquarters via U.S. mail to each individual. However, I hold that the 1988 Notice and the 1992 Notice were delivered by methods reasonably calculated to ensure their receipt, but that the 1990 Notice was not delivered by a sufficient method, and thus was procedurally inadequate in addition to being substantively inadequate.

Pursuant to section 204(h), no plan amendment can be effective unless proper written notice is given to "each participant" and "each beneficiary" at least fifteen days before its effective date. COBRA § 11006(a), 100 Stat. at 243 (codified as amended at 29 U.S.C. §

1054(h)).  If distribution of the notice does not satisfy the statutory standard, the plan amendment

cannot become effective, and participants remain entitled to benefits provided prior to such

amendment.  Id.

The regulations that implemented section 204(h), promulgated in temporary form

in 1995, after the events in issue in this case, required the plan administrator to "use any method

reasonably calculated to ensure actual receipt."  60 Fed. Reg. at 64,323.  The regulation specified

that first class mail to the last known address is acceptable, as is hand delivery.  Id.  The

regulations promulgated in 2003 further clarified that the administrator must deliver notice

"through a method that results in actual receipt . . . or the plan administrator must take

appropriate and necessary measures reasonably calculated to ensure that the method . . . results in

actual receipt."  68 Fed. Reg. at 17,287.  Posting on a bulletin board was not an acceptable

method of delivery under either set of regulations.  Cf. Roadmaster, 954 F.2d at 1403.

Addressing a parallel section of ERISA, section 104(b)(1)(A) relating to

distribution of SPDs, the Court of Appeals for the Second Circuit held that "the plan

administrator must make reasonable efforts to ensure each plan participant's actual receipt of the

plan documents."  Leyda v. AlliedSignal, Inc., 322 F.3d 199, 208 (2d Cir. 2003) (citing 29

C.F.R. § 2520.104b-1(b)(1)).  The standards for delivery of SPDs, although not controlling, 29

C.F.R. § 2520.104b-1(e), are certainly relevant to the issue of effectiveness of Equitable's

procedures.

Defendants argue for a lesser standard, contending that there should be a

presumption that compliance with normal office procedures should give rise to an inference of

actual receipt.  See FTI Consulting, Inc. v. Rossi, No. 03-cv-4033, 2004 U.S. Dist. LEXIS 2860,

at *14-*15 (S.D.N.Y. Feb. 25, 2004) (applying New York state law notice standards to mailing

of invoices in suit for attorney's fees) (citing <u>Meckel v. Cont'l Res. Co.</u>, 758 F.2d 811, 817 (2d Cir. 1985) (applying New York state law notice standards to proof of mailing of securities redemption notices)). However, Defendant's cases, pertaining to notices sent by U.S. mail, do not pertain to federal statutory standards of notice under ERISA.

Section 204(h) and the regulations later promulgated do not require a specific method of delivery. Generally, hand delivery of notices to participants' desks and/or cubby holes, in addition to mailing of the notices to participants not in the office, can meet that standard, provided that there is assurance that procedures for distribution actually were followed and that they were effective. I find that the deliveries of the 1988 Notice and the 1992 Notice were sufficient. However, I find that the 1990 Notice was ineffective because of inadequate assurances of prompt and reliable delivery.

The absence of a corporate written protocol covering these bulk deliveries makes it difficult to make a reliable finding that Equitable's delivery system was reasonably calculated to cause notices of amendments to be given to each participant. The testimony of Equitable's executives that Equitable's bulk deliveries to divisional and agency offices can be likened to pay checks cannot fully be credited because the Notices, unlike paychecks, were not individually addressed to recipients and were susceptible to being left in busy mail rooms for later delivery when deliveries could be made more conveniently. Although Equitable's Benefits Administration executives testified that they were confident that participants actually received the notices of amendments, they based their confidence on anecdotal evidence, from many phone calls they claim to have received regarding the notices, and from large attendance at road show meetings by recipients who had the notice with them. (<u>See</u>, <u>e.g.</u>, Tr. 47-49, 128). But this is not the kind of reliable evidence that could lead to a confident finding that Equitable's procedures

were reasonably calculated actually to give notice to all participants potentially affected by the notice.

This is particularly the case with regard to the 1990 Notice, that which de-grandfathered Equitable's employees and managers who worked for Equitable before 1989, but did not satisfy the amended requirements of having reached fifty years of age or twenty or more years of service as of December 31, 1990. That 1990 Notice was not distributed in a way reasonably calculated to ensure its receipt. It was not accompanied with instructions regarding who was to receive it. It was separated into two documents, a cover letter with an executive summary and a one-and-a-half page letter with a longer description of the amendment. One manager testified that, given its insignificant appearance, it was not treated as priority material. Nearly none of Plaintiffs' witnesses remembered having received the 1990 Notice.

There was consensus, however, that the ten-page 1988 Notice and the seventy-five-page 1992 SPD were received by substantially all participants and beneficiaries. The 1992 Notice, a glossy booklet contained in a box, was too thick to be inserted into mail pigeon-holes, and too important-looking to be stored on mail room shelves. They were distributed directly to the desks of active employees, managers and agents, or mailed to employees who were away from the office on short or long term disability. Plaintiffs, as well as defendants' witnesses, remembered having received the booklets.[8]

## V. AGE DISCRIMINATION

The Cash Balance plan that Equitable proposed as an amendment to its pre-1988 Defined Benefit plans provided for monthly increases to an employee's Cash Account by adding

---

[8] The exception was Ann Nussbaum, and her testimony on the point was not credible.

Pay Credits—a stated percentage of each year's compensation—and Interest Credits—interest calculated on the accumulation. Thus, the Cash Accounts grow, in part, by compounding interest, that is, interest is to be calculated on prior month's accumulations of interest and principal, at an average of Treasury Bill rates before 1996, and at not less than a minimum rate after 1996. Inevitably, the longer an employee works before reaching normal retirement age, the more interest accumulates in the employee's Cash Account, and the larger the employee's annuity will be following retirement or earlier termination.

Plaintiffs argue that this feature of Equitable's Cash Balance plan discriminates against older workers, for the younger the participating worker, the more interest that will accumulate in the employee's Cash Account by the time the employee reaches normal retirement age, or terminates employment. The discrimination, Plaintiffs argue, is another ground for invalidity, and another reason why Equitable's Cash Balance plan should not become effective. Defendant argues that its plan does not discriminate, that the differences in accumulations reflect the time value of money, between the time that retirement benefits are earned to the time they may be distributed.

I hold that Equitable's Cash Balance plan does not discriminate because of attainment of any age. My discussion below sets out the statutory provisions and legislative history, and discusses the proposed, but withdrawn, regulations, and the few relevant, and contradictory, cases.

**A. Law**

*i. Statutory Provisions*

The Age Discrimination in Employment Act of 1967 ("ADEA"), Pub. L. No. 90-202, 81 Stat. 602 (codified as amended at 29 U.S.C. § 621 et seq. (2006)), prohibits employers

from "discriminat[ing] against any individual with respect to . . . compensation." Id. § 4(a)(1), 81 Stat. at 603. A 1986 amendment to the ADEA made that proscription with regard to discrimination in benefits explicit; employers may not maintain an employee pension benefit plan that permits "the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age." See Omnibus Budget Reconciliation Act of 1986 ("OBRA of 1986"), Pub. L. No. 99-509, § 9201, 100 Stat. 1874, 1973 (codified as amended at 29 U.S.C. § 623(i)(1)). Similarly, OBRA of 1986 amended section 204(b)(1)(H) of ERISA to the same effect, to prohibit defined benefit plans under which "an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." Id. § 9202(a)(2), 100 Stat. at 1975 (codified at 29 U.S.C. § 1054(b)(1)(H)(i)). The Internal Revenue Code was also amended in similar fashion. Id. § 9202(b)(3), 100 Stat. at 1977 (codified at 26 U.S.C. § 411(b)(1)(H)). The statutory amendments were effective for plan years beginning on or after January 1, 1988. Id. § 9204(a)(1), 100 Stat. at 1979.

The statutory provisions do not define "rate of . . . benefit accrual" or "because of attainment of any age."[9] Proposed regulations sought to define those terms, but were withdrawn

---

[9] "Accrued benefit" is defined for both defined benefit and defined contribution plans. For defined benefit plans, ERISA prohibits the reduction in "accrued benefit" "on account of any increase in . . . age or service," ERISA § 204(b)(1)(G) (codified at 29 U.S.C. § 1054(b)(1)(H)) where accrued benefits are the "annual benefit commencing at normal retirement age," ERISA § 3(23)(A) (codified at 29 U.S.C. § 1002(23)(A)).

      For defined contribution plans, ERISA prohibits reduction of the "rate at which amounts are allocated to the employee's account" because of age. ERISA § 204(b)(2)(A) (codified at 29 U.S.C. § 1054(b)(2)(A)). For defined contribution plans, ERISA defines accrued benefit as the "balance of the individual's account." ERISA § 3(23)(B) (codified at 29 U.S.C. § 1002(23)(B)).

      The term "rate of future benefit accrual" in the notice requirements of ERISA has been interpreted to mean the "amount of future annual benefit commencing at normal retirement age." 63 Fed. Reg. at 68,681 (final regulation for section 204(h) notice requirements in the event of a "significant reduction in the rate of future accruals").

in the expectancy of further Congressional amendments, which did not occur. The legislative history also sheds light on the appropriate interpretation of the relevant statutory terms.

### i. The Legislative History

ERISA is structured to deal with two types of pension plans: defined benefit plans and defined contribution plans—the former providing for benefits that will be available to participants upon reaching a normal retirement age, and the latter providing for annual contributions made by employees and, depending on the plan, by matching employer contributions. ERISA §§ 3(35), 3(34) (codified at 29 U.S.C. §§ 1002(35), 1002(34)); Esden, 229 F.3d at 158-59 ("It is undisputed that the governing statutes were . . . developed with traditional final-pay defined benefit plans in mind; they do not always fit in a clear fashion with cash balance plans . . . ."). Accounts created under defined contribution plans vest immediately, with the employee bearing the risk of increases and decreases from investments of the corpus of prior years' accumulations. Inevitably, younger employees will have a longer time than older employees to accumulate increases in defined contribution accounts before reaching normal retirement age. Defined benefit plans, in contrast, impose risk on the employer, for they promise employees a certain level of pension upon their reaching normal retirement age. Defined benefit plans typically graduate benefits according to years of service and levels of compensation according to some form of index, and not according to an employee's age.

OBRA of 1986 was not intended to change the typology of the plans, nor the method by which retirement benefits were accumulated. As the legislative history makes clear, the statutory amendment was intended to prevent discrimination against employees who wished to work past their normal retirement age without compromising their ability to continue earning pension benefits. Section 9202 of OBRA of 1986 was entitled "Benefit Accrual Beyond Normal

Retirement Age," OBRA of 1986 § 9202, 100 Stat. at 1975, a title that reflected the focus of the Senate and the House to protect older workers who wished to continue to work past their normal retirement ages without prejudicing the rate by which their pension benefits would continue to accrue.  The same was the case with the parallel amendment to the Internal Revenue Code, entitled "Continued Accrual Beyond Normal Retirement Age."  Id. § 9202(b)(1), 100 Stat. at 1977 (codified at 26 U.S.C. § 411).  As the Conference Report made clear, both the Senate and the House bills "require[d] a plan to provide for benefit accruals . . . after normal retirement age;" to "require continued pension benefit accruals for workers who work past the normal retirement age of 65."  H.R. Rep. 99-1012, at 367 (1986) (Conf. Rep.), 131 Cong. Rec. 18,868 (July 11, 1985).  The Conference Report made clear also that "the rules preventing the reduction . . . of benefit accruals on account of the attainment of age are not intended to apply . . . for employees who have not attained normal retirement age."  Id. at 379.  And the Conference Report supported a bill intended to "extend[] valuable pension accrual protections to older Americans who work beyond normal retirement age."  132 Cong. Rec. 32,963 (Oct. 17, 1986).  Thus, the legislative history shows the Congressional focus to have been on workers passing their normal retirement ages, and reflects the intent of Congress to allow such workers to continue to work without prejudicing their pension benefits, or the rate by which their pension benefits were to grow.

          The Conference Report and statutory headings are useful guides for discerning Congressional intent when statutory intent may be subject to varying possibilities of meaning.  See Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998); see also Disabled in Action of Met. N.Y. v. Hammons, 202 F.3d 110, 124 (2d Cir. 2000) ("[N]ext to the statute itself," "the conference report represents" "the most authoritative and reliable material of legislative history,"

"[b]ecause a conference report represents the final statement of terms agreed to by both houses . . . ." (internal quotation marks omitted)).  Statutory headings consistent with legislative history may be particularly useful.  Barnes v. Oddo, 219 F.2d 137, 142 (2d Cir. 1955) (headings "shed light on some ambiguous word").  This is particularly true where the headings are consistent with the ordinary meaning of the statute.  Bhd. of R.R. Trainmen v. Balt. & O.R. Co., 331 U.S. 519, 528-29 (1947).  But it is important to note that OBRA of 1986 forbade reduction in rate of benefit accruals because of age generally, and legislative history comes into play only when the statutory text is ambiguous.  W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99 (1991).

Plaintiffs argue that the compound interest features of Equitable's Cash Balance plan enable younger workers to accumulate interest over longer periods of time, causing such plans to be age-discriminatory according to the general proscription of the statute.  Plaintiffs argue that the "rate of . . . benefit accrual" is greater for younger workers than for older workers. Before rejecting this argument, my discussion first analyzes the regulations proposed by the Equal Employment Opportunity Commission and the Internal Revenue System, and then discusses the several cases that have ruled on this issue.

ii.    *The Proposed Regulations*

OBRA of 1986 amended the Internal Revenue Code, ERISA and the ADEA, and granted power to each of the agencies charged with implementing those statutes to issue regulations "consistent with the others."  Id. § 9204(d), 100 Stat. at 1980.  The Equal Employment Opportunity Commission ("EEOC"), pursuant to the statutory delegation, proposed rulemaking for both defined contribution and defined benefit plans, 52 Fed. Reg. 45,360 (proposed Nov. 27, 1987), forbidding limitations in rates of benefit accruals "determined by reference to age," or "not determinable except by reference to age."  Id. at 45,362.  The EEOC's

proposed regulations also provided that "[a]ny amendment to a defined benefit plan . . . that reduces the rate of benefit accruals for a plan year may not vary the rate of such reduction based on the age of a participant." Id. at 45,363.

The 1988 proposed IRS regulations were more focused on the Congressional concern, as reflected by the title, "Continued Accruals Beyond Normal Retirement Age." See Prop. Treas. Reg. § 1.411(b)-2, 53 Fed. Reg. 11,876 (Apr. 11, 1988). According to the proposed regulations, the rate of benefit accrual was to be considered reduced by an amendment to a defined benefit plan when the benefits or allocations promised to the employee on his reaching a certain age would no longer be provided at that age. Id. at 11,877. Specifically, the "rate of an employee's benefit accrual under a defined benefit plan" is considered to be "reduced on account of the attainment of a certain age" when "rights or features under a plan that are provided with respect to benefits or allocations prior to such age are not provided . . . with respect to benefits or allocations after such age." Id. But a "positive correlation between increased age and a reduction or discontinuance in benefit accruals or account allocations" was not by itself sufficient to be considered discrimination because of age, particularly if the amendment affected "all plan participants." Id. at 11,879. In order to be considered discriminatory, the limitation had to be either "determined by reference to age," or not determinable "except by reference to age." Id. at 11,880. The IRS issued an illustrative example of its proposed regulation: if a plan were to provide a maximum credit for thirty-five years of credited service, and provide that service beyond that is not to be taken into account in determining the retirement benefit, the plan would not be considered discrimination because of age. Id.

The 1988 proposed IRS regulations did not become effective. In 1999, the IRS again sought comment on proposed regulations, "particularly with respect to conversions of . . .

defined benefit pension plans into cash balance plans." Defined Benefit Pension Plans; Solicitation for Comments, 64 Fed. Reg. 56,578 (Oct. 20, 1999). Its focus was to forbid potential "wear-away" in such conversions, a feature which caused a higher benefit of a defined benefit plan to reduce the employer's contributions to an employee's cash account until the higher benefit of the supplanted defined benefit plan had been "worn away." Id. at 56,579.

Again in 2002, the IRS proposed regulations, Prop. Treas. Reg. § 1.411(b)-2, 67 Fed. Reg. 76,123 (Dec. 11, 2002), interpreting the statutory text more generally than indicated by the Conference Report and the legislative headings. The 2002 proposed regulations defined the "attainment of any age" as "growing older," and clarified that the prohibition applies "regardless of whether a participant is younger than, at, or older than normal retirement age." Id. at 76,131. The proposed regulations defined discrimination because of the attainment of an age as occurring if "any participant's rate of benefit accrual for the plan year would be higher if the participant were younger." Id. at 76,124. As with the 1988 proposed regulations, the 2002 proposed regulations made clear that age discrimination does not result "solely because of a positive correlation between attainment of any age and a reduction in the rate of benefit accrual." Id. at 76,125.

The 2002 proposed IRS regulations treated cash balance plans separately from traditional defined benefit plans.[10] Acknowledging the compounding of interest inherent in such plans, the proposed regulations interpreted "rate of . . . benefit accrual" as not causing cash balance plans to be discriminatory. Specifically, the 2002 proposed regulations acknowledged that "[u]nder a cash balance plan, the interest credits for a younger participant will compound

---

[10] The Court of Appeals for the Second Circuit has deemed IRS regulations that treat cash balance plans separately and distinctly from defined benefit plans as "reasonable and consistent." Esden, 229 F.3d at 162.

over a greater number of years until normal retirement age than for an older participant." Id. at

76,126. The proposed regulations, far from forbidding such interest accumulations, made them

mandatory, for cash balance plans that did not provide for future interest credits, including after

normal retirement age, were prohibited. Id. Thus, the 2002 proposed regulations provided that,

for cash balance plans, "the rate of benefit accrual . . . is permitted to be determined as the

addition to the participant's hypothetical account for the plan year," id. at 76,131, making it clear

that greater and lesser accumulations resulting from compounding of interest would not be a

basis for finding age discrimination.

   As with the regulations proposed by EEOC, the regulations proposed by the IRS

did not become effective. The 2002 proposed regulations were withdrawn by the IRS in 2004 to

allow for a statutory treatment of cash balance plans and age discrimination by Congress. I.R.S.

Announcement 2004-57, 2004-2 C.B. 15. To date, Congress has not acted.

   Proposed regulations do not have the force of law. They are entitled to respect to

the extent that they have the power to persuade. Christensen v. Harris County, 529 U.S. 576,

587 (2000). Clearly, the proposed regulations are consistent with the legislative text in

forbidding discrimination at any age. Recognition of the propriety of compounding of interest

ensures that when benefits become available at retirement they do not suffer from attrition due to

inflation, and thus preserves the value of the benefits for young and old workers. Thus, the

proposed regulations are consistent both with the statutory text and the legislative history. They

are consistent also with regulatory interpretations of related statutes. See Dep't of Treasury,

General Explanations of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005)

("[C]ash balance plans and cash balance conversions are not inherently age-discriminatory.");

Dep't of Treasury, General Explanations of the Administration's Fiscal Year 2005 Revenue

Proposals 104 (2004) (same). For another example, the regulations implementing Section 411(b)(1)(H) of the Tax Code indicate that interest credits should not by themselves render a plan discriminatory. The "fact that interest adjustments through normal retirement age are accrued in the year of the hypothetical allocation will not cause a cash balance plan to fail to satisfy the requirements of" the Tax Code provision prohibiting reduction of rate of benefit accruals because of age. Treas. Reg. § 1.401(a)(4)-8, 56 Fed. Reg. 47,524, 47,528 (1991) (implementing 26 U.S.C. § 411(b)(1)(H)).

### iii. *The Caselaw*

Four courts have ruled on the issue that I have to decide, whether compounding of interest on cash account accumulations constitutes age discrimination in violation of ERISA. Three have held that ERISA was not violated; one that it was. I discuss these cases below, and my own opinion agreeing with the majority, that ERISA was not violated.

In Eaton, the District Court of Southern Indiana was influenced by the "strong indications in the statutes and the legislative history . . . that Congress did not intend to apply those provisions to the rate of benefit accrual for employees who have not yet reached retirement age." Eaton v. Onan Corp., 117 F. Supp. 2d 812, 826 (S.D. Ind. 2000). After close consideration of statutory headings and legislative history, the court concluded that, based upon "both the OBRA 1986 Conference Report and the statements of legislators leading the push for these specific provisions . . .[,] differences in the rate of benefit accruals of those participants who had not yet reached normal retirement age would not violate the pension age discrimination provisions, at least as long as the benefit accruals satisfied the more general accrual rules." Id. at 829. The District Court of Maryland agreed, without adding significant additional comment. Tootle v. ARINC, Inc., No. 03-cv-1086, 2004 U.S. Dist. LEXIS 10629, at *15-16 (D. Md. June

10, 2004). The Court of Appeals for the First Circuit, in dicta, ruled also that "the ERISA age discrimination provision may not even apply to workers younger than the age of normal retirement." Campbell, 327 F.3d at 9. The Court of Appeals was persuaded that the statutory headings and the legislative history "buttresse[d] this argument." Id.

However, the District Court of the District of Connecticut, noting "that its decision on this issue is contrary to that of several other courts," held to the contrary. Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150, 161 (D. Conn. 2006). United States District Judge Janet Hall stated her belief that the phrase, "attainment of any age," was "unambiguous with respect to the question of whether it protects only employees who have reached age 65," and that the legislative history was "not as clear as [the other cases] would make it out to be, and could lend some support to both sides." Id. at 158. Thus, the Conference Report, discussing "'the number of years of service an employee may complete between date of hire and the attainment of normal retirement age, arguably was stating '" a "much different proposition" than that relied upon by the courts in Eaton, Tootle, and Campbell. Id. at 160 (quoting H.R. Rep. 99-1012, at 379). As to the floor statements, these would not "override the meaning arising from the clear statutory text." Id. Finally, the now-withdrawn proposed 2002 regulations, which explicitly extended the provisions in the analogous Tax Code amendment to all participants "'regardless of whether the participant is older than, younger, than or at normal retirement age,'" id. (quoting 67 Fed. Reg. at 76,124), confirmed that the plain meaning of the statute should control. Thus, the District Court concluded that the Richards plaintiffs had standing to complain that the compound interest features of FleetBoston's cash account pension plan constituted age discrimination, and had the right to make that claim even before they reached retirement age. Id.

The key issue in interpreting the statute is the phrase "rate of . . . benefit accrual."

Judge Hall considered that because of compounding of interest, younger employees experience a

greater rate of accrual than do older employees. She relied upon Second Circuit precedent set

out in Esden, which established that definition for the term "accrued benefit" for cash balance

plans is the same as that for defined benefits plans, that is "'the individual's accrued benefit

determined under the plan . . . and expressed in the form of an annual benefit commencing at

normal retirement age.'" 427 F. Supp. 2d at 165 (quoting ERISA § 3(23)(A) (codified at 29

U.S.C. § 1002(23)(A)); citing Esden, 229 F.3d at 158).[11] The court thus concluded that "ERISA

itself requires the court to compare annual benefits commencing at normal retirement age when

considering age discrimination in a cash balance plan under section 204(b)(1)(H)." Id. at 167.

However, the majority of cases that have considered the interpretation of "the rate

of an employee's benefit accrual" consider that the rate is to be measured as the change in each

year's cash account balance, and not in the change in post-retirement annuity. See Register v.

PNC Fin. Servs. Group, Inc., No. 04-cv-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005);

Tootle, 2004 U.S. Dist. LEXIS 10629; Eaton, 117 F. Supp. 2d 812; see also Campbell, 327 F.3d

at 10 (citing "critics of the age discrimination argument [who] have contended that there are

_____

[11] Judge Halls' reliance on Esden is misplaced.

    The Esden case dealt with manipulation of interest rates to cancel a benefit
accrued to participants. The court reached its conclusion regarding the definition of accrued
benefit for cash balance plans by noting that though "a cash balance may be" "'hybrid' in
design," "it remains subject to a regulatory framework that is in many respects rigidly binary,"
Esden, 229 F.3d at 159 n.6, and may "sometimes require outcomes that are in tensions with the
objectives of those plans." Id. at 159.

    But Esden itself recognized that cash balance plans can be treated distinctly as
well. Esden, 229 F.3d at 162. The 2002 proposed IRS regulations also created a separate
treatment for cash balance plans, one which provided explicitly that the effects of compounding
would not be considered discriminatory under the statute. Nothing in the legislative history or
the statutory text makes reference to cash balance plans as a distinct category, for only two
categories were recognized—defined benefit plans and defined contribution plans—and cash
balance plans developed as a species of defined benefit plans.

various methods for determining benefit accrual rates under ERISA," and concluding that "it is by no means clear that the annuity method is the only permitted method in this context").  But see Cooper v. IBM Personal Pension Plan, 274 F. Supp. 2d 1010 (S.D. Ill. 2003).

The Southern District of Indiana, in Eaton, considered that the issue required an analysis of the time value of money, and that cash balance plans should be treated like defined contribution plans in this respect.  If interest was not to be required in determining each year's account balance, employers would gain a perverse incentive to withhold interest credits.  117 F. Supp. 2d at 830-34.  Agreeing with the holding by the Eaton court, the Eastern District of Pennsylvania, in Register, noted that "[c]ash balance plans accrue benefits differently than traditional defined benefit plans."  2005 WL 3120268, at *7.  The court argued that from the different structure in accrual benefits, "it follows logically that the rate of benefit accrual [for cash balance plans] is determined by the change in the account balance."  Id.  But see Richards, 427 F. Supp. 2d at 167 (rejecting Reigster's reasoning as contrary to precedent set out in Esden, 229 F.3d at 158-59).  The Register court further relied upon the Conference Report on OBRA 1986 and Treasury regulations, which it noted "buttress[]" its view, id. at *7-8, to the effect that accrual rate should be defined as "'the change in the employee's cash balance account from one year to the next.'"  Id. at *8 (quoting Eaton, 117 F. Supp. 2d at 832-33).  The District of Maryland agreed in Tootle, reasoning that "[t]he more sensible approach is to measure benefit accrual under cash balance plans by examining the rate at which amounts are allocated and the changes over time in an individual's account balance, as the ERISA provisions designed for traditional defined contribution plans would direct."  2004 U.S. Dist. LEXIS 10629, at *17-18.

**B.   Discussion**

I hold that Equitable's Cash Balance plan does not discriminate because of age in violation of section 204(b)(1)(H) of ERISA. The application of the age discrimination prohibition contained in section 204(b)(1)(H) of ERISA to workers of all ages is, in my opinion, the necessary consequence of the broad language employed by the statute. The compounding of interest does not, in my opinion, cause a reduction in the rate of benefit accruals because of the attainment of any age. Equitable's plan does not provide any rights or features to one group of participants that are different from those provided to another group of older, or younger, participants. Each participant, regardless of age, is entitled to the same rate of employer contributions, with the only variables being the amount of compensation paid to that participant and the number of years before normal retirement age. Each participant, regardless of age, is entitled to increases in the participant's Cash Account according to the same interest rate, without any variation according to age.

Participants become entitled to contributions to their Cash Accounts each month. By law, contributions must be frontloaded, that is, the employer must incur an actual obligation for each month's contribution owed to that participant, and interest thereon, virtually as if the employee owned that account.[12] Otherwise, a dollar paid or obligated today but not distributable to the beneficiary for a number of years would be worth less than a dollar paid or obligated in some future year to that beneficiary. The payment of interest, actually or by implication, maintains the value to the participant of the employer's contribution, without attrition from inflation, and prevents the employer's obligation from being diminished in value. In terms of

---

[12] Cash balance plans are "frontloaded" in order to comply with tax regulations, with interest credits accruing at the same time as pay credits accrue. The 2002 proposed IRS regulations prohibited cash balance plans that did not provide for interest credits. 67 Fed. Reg. at 76,126. The IRS also requires, for tax benefit eligibility, that cash balance plans be frontloaded. I.R.S. Notice 96-8, 1996-1 C.B. 359.

change in Cash Account balance, the rate and amount of contribution is the same to all participants, whatever their age. That equality could not be achieved if a younger worker, who has longer to work until normal retirement age, were to be prevented from earning compounding interest on the worker's Cash Account balance. The compounding of interest, that is, the payment or contribution of interest on prior months' accumulations, make it possible for all participants to be treated equally, and that necessarily means that accumulations will be larger according to the number of years that a participant has to wait until normal retirement age. Thus, the rate of contributions to Cash Account balances, and thus the rate of benefit accrual, do not change; they are equal regardless of age.

This phenomenon is well illustrated by Judge Posner's analysis in Berger and Judge Leval's analysis in Esden. In Berger, the Xerox corporation, having given its employees a choice, to be made at retirement or earlier termination, between its defined contribution plan and its cash balance plan, was asked to liquidate certain terminating employees' cash balance accounts. 338 F.3d at 757-58. Xerox, instead of adding accumulations at an estimation of the variable contract interest rate to normal retirement age, and then discounting according to the statutorily-prescribed discount rate, simply constructed an equivalence between the two interest rates and offered a cash-out of the existing balance in the cash account. Id. at 758-59. The Court of Appeals for the Seventh Circuit held that striking the equivalence was error, and that an estimation of the variable interest rate must be used in future projection. Id. at 760-61. Since contract rates and market rates are likely to differ, an estimated progression of accumulations, followed by a discounting to present value, must take place. Similarly, in Esden, Bank of Boston calculated the present value of post-retirement annuity for purposes of an early lump-sum distribution as merely the current cash account balance, rather than projecting forward using a

rate at least as much as the minimum guaranteed interest rate under the plan and discounting

back at the statutorily-prescribed discount rate. 229 F.3d at 161-62. The Court of Appeals for

the Second Circuit held that the current cash account balance was not the actuarial equivalent of

the post-retirement annuity, and thus the cash out represented a prohibited forfeiture. Id. at 162-

68.

Berger and Esden both sought to preserve the value of employees' cash accounts.

Both recognized that the manipulation of interest rates can substantially diminish pension values.

That same purpose in the case argues, most powerfully, for the requirement of compounding as

an essential feature of preserving value. The plaintiffs in Berger and Esden did not allege, nor

did the Courts of Appeals find, age discrimination in the application of interest credits to cash

balance plans. The foci, and the statutory violations, were the actuarial equivalents of cash

account balances as augmented by compounded interest until retirement. In none of the cases

did "the rate of an employee's benefit accrual" vary because of attainment of any age. ERISA §

204(b)(1)(H)(i) (codified at 29 U.S.C. § 1054(b)(1)(H)(i)). Age discrimination does not arise

from neutral application of interest to yearly account balances.

If Congress had intended the term "accrued benefit"—and its statutory meaning

of post-retirement annuities under section 3(23)(A)—to apply to section 204(b)(1)(H)(i),  it

would have included such language in section 204(b)(1)(H)(i). Instead, Congress used "rate of

benefit accrual" and left that term undefined. The ambiguity allows for multiple interpretations,

so that the measure used to determine discrimination for traditional defined benefit plans may be

fashioned to fit the structure of those cash balance plans, and the measure used for cash balance

plans may be fashioned to fit those plans. The proposed regulations of 2002, though withdrawn,

point toward an appropriate treatment of cash balance plans within the greater context of defined

benefit plans. 67 Fed. Reg. at 76,131. Applying that standard, it is clear that Equitable's plan does not reduce the "rate of an employee's benefit accrual" "because of attainment of any age." The plan merely preserves the time value of money, and thus treats all participants equally.

## VI. Conclusion

For the reasons stated, I hold that Equitable's Cash Balance plan does not discriminate on the basis of age, but the 1990 Notice, which applied the plan to de-grandfathered employees and managers, was both substantively and procedurally inadequate. The Cash Balance plan, thus, could not have become effective before January 1, 1993, for it was not until approximately December 10, 1992 when Equitable, in its SPD, gave written notice of its amendments to each plan participant.

An appropriate remedy needs to be determined, in relation to the several claims for relief alleged in the Amended Complaint filed April 1, 2003. Does the Cash Balance plan go into effect for agents based on good notice in the November 1992 Notice? Does the Cash Balance plan fail to go into effect for agents because it was merged into what has now been ruled an ineffective plan? Does the Cash Balance plan go into effect for employees and managers on the basis of the 1992 Notice?

The parties, by their respective counsel, shall submit papers by August 7, 2006, addressing the issue of a remedy not inconsistent with the rulings contained in this opinion and final judgment on all issues raised by the pleadings, and shall appear for argument on same August 15, 2006 at 10 am.

So Ordered.
Dated:     New York, New York
           July 20, 2006

Alvin K. Hellerstein
United States District Judge

63